```
UNITED STATES DISTRICT COURT              FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

RAYMOND CRUZ,

                Plaintiff,                                  MEMORANDUM
                                                            AND ORDER
                                                            07-CV-4658 (JG)
        -against-

MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,

                Defendant.
-----------------------------------------------------------x
```

A P P E A R A N C E S :

       RAYMOND CRUZ
            176 Decatur Street, Apt 3-A
            Brooklyn, NY 11233
            Plaintiff, *Pro Se*

       BENTON J. CAMPBELL
            United States Attorney
            Eastern District of New York
            271 Cadman Plaza East
            Brooklyn, NY 11201
       By:   Steven M. Warshawsky
            Attorney for Defendant

JOHN GLEESON, United States District Judge:

       Raymond Cruz brings this *pro se* action under 42 U.S.C. § 405(g), seeking review of the final decision of the Commissioner of Social Security determining that he is not entitled to disability insurance benefits under the Social Security Act. The Commissioner moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons stated below, the motion is granted.

## BACKGROUND

A.  *Non-Medical Evidence*

Cruz was born in Puerto Rico on March 15, 1960. R. 42. He has a high school equivalency diploma and has served in the U.S. Army. *Id.* at 68, 394-95. His most recent employment, which ended on December 1, 2002, *id.* at 42, 62, was as a stacker in a cardboard factory, *id.* at 62-63, 365. This job required him to lift and carry between 10 and 40 pounds of cardboard, and to walk and stand approximately 7 hours a day. *Id.* at 63, 365-67. He also performed other minimum wage factory and food preparation jobs. *Id.* at 62-63, 367-69.

In December 2002, Cruz hurt his back, and afterward his right knee, which had been the subject of previous surgery, began to deteriorate. *Id.* at 370-71. In 1992, he was diagnosed with HIV, *id.* at 370, and he stopped taking his medications in 2003 because they caused severe weight loss, *id.* at 392-93. His T cells are at acceptable levels currently. *Id.* at 393. Cruz claims that he cannot work due to his knee problem and depression to approximately equal degrees. *Id.*

Cruz's right knee is afflicted with stabbing pain every day for most of the day. *Id.* at 92-93. Squatting and kneeling are difficult, and he occasionally uses a cane or crutches. *Id.* at 89, 391. He takes 600 mg of Ibuprofen several times per day, and also uses Ace bandages, hot baths, massages, and over-the-counter gels and ointments. *Id.* at 93-94. In the Disability Report he included in his application, he stated that he can lift up to 10 pounds, stand for 15 minutes at a time, and walk for three blocks before resting for 5-10 minutes. *Id.* at 85, 89-90. At his benefit eligibility hearing, he indicated that he can lift up to 10 or 20 pounds, stand and sit for an hour at a time, and walk five or six blocks at a time before resting. *Id.* at 374, 391-92. He had knee

surgery in 2004, which caused improvement until he fell and reinjured his knee approximately 18 months later. *Id.* at 376-78. He also has itchy and painful lesions on his feet occasionally due to psoriasis and an inherited condition. *Id.* at 383-84.

Cruz also complains of difficulty concentrating, *id.* at 62, problems with stress and memory, *id.* at 91, and difficulty sleeping, *id.* at 384. He claims to experience suicidal thoughts and voices telling him to kill himself "off and on." *Id.* at 384-88. He hates "society in general" due to being incarcerated several times. *Id.* at 386.

Cruz lives alone in a third-floor walk-up apartment in Brooklyn, where he moved from Connecticut in 2003. *Id.* at 84, 362-64. He is able to manage his financial affairs, groom himself, take his medications, clean (including sweeping, mopping and garbage disposal), do laundry once a week, buy groceries twice a week (his shopping trips typically take between an hour and a half and three hours), and cook for himself. *Id.* at 85-88, 381, 391. He can walk and take public transportation and goes outside three or four times per week. *Id.* at 87.

Cruz spends his time reading, watching television, playing video games, and engaging in arts and crafts. *Id.* at 88, 94. He socializes and attends meetings about HIV, alcoholism and anger management at Housing Works, a social support center offering services to low-income individuals with HIV/AIDS. *Id.* at 360, 390. He travels there by subway three or four times a week, spending three to six hours at a time there. *Id.* Cruz enjoys going to Housing Works, and denies having any difficulty getting along with authority figures. *Id.* at 90, 382.

B.  *Medical Evidence*

   1.  *Hospital for Joint Diseases*

New York University Medical Center's Hospital for Joint Diseases has treated Cruz's right knee injury since before the onset of Cruz's alleged disability on December 1, 2002. He complained on September 29, 1999 of right knee pain that had worsened since an accident two years earlier. R. 183-84. Although there were mild clicks when he flexed his knee, there was no joint swelling or redness. *Id.* at 183. An orthopedic clinic examination on October 20, 1999 showed mild atrophy and mild medial knee pain, but a full range of motion. *Id.* at 182. An X-ray taken on that date showed a fracture of indeterminate age, and a possible enchondroma.[1] *Id.* at 181. Magnetic resonance imaging ("MRI") taken on November 30, 1999 revealed an anterior cruciate ligament (ACL) tear and a bone bruise, prior hemarthrosis[2] and a small cyst, and confirmed the old fracture and potential enchondroma suggested by the X-rays. *Id.* at 167-68. At a January 26, 2000 visit to an oncology clinic, Cruz was diagnosed with a benign enchondroma tumor not requiring treatment. *Id.* at 165.

On March 15, 2000, Cruz was diagnosed with a stable ACL tear and possible damage to the meniscus. *Id.* at 163.[3] He underwent arthroscopy[4] on his right knee on March 31, 2000, along with partial synovectomy[5] and shaving chondroplasty.[6] *Id.* at 178-79. On August 1,

---

[1]  An enchondroma is a type of tumor. Felix S. Chew, Enchondroma and Enchondromatosis, *eMedicine from Web MD* (2006), http://www.emedicine.com/radio/TOPIC247.HTM.
[2]  Hemarthrosis is bleeding into a joint. WebMD, *Hemarthrosis* (2007), http://www.webmd.com/hw-popup/hemarthrosis.
[3]  The meniscus is a disc cushioning the knee. WebMD, *Meniscus Tear* (2006), http://www.webmd.com/a-to-z-guides/meniscus-tear-topic-overview.
[4]  Arthroscopy is an outpatient surgical procedure commonly used to diagnose knee and shoulder injuries. WebMD, *Arthritis: Arthroscopy* (2007), http://www.webmd.com/osteoarthritis/guide/arthritis-arthroscopy.
[5]  Synovectomy is surgical removal of inflamed joint tissue. WebMD, *Synovectomy for Rheumatoid Arthritis* (2006), http://www.webmd.com/rheumatoid-arthritis/synovectomy-for-rheumatoid-arthritis.

4

2000, he underwent successful ACL reconstruction. *Id.* at 170-72. On March 14, 2001, Cruz visited the clinic and reported that he fell in December of 2000, causing knee pain. *Id.* at 147. The impression was a possible meniscal tear. *Id.*

On May 7, 2003, Cruz complained of knee pain with mechanical symptoms and pain when he bent his knee deeply after a fall three weeks prior. *Id.* at 283-84. He showed right knee tenderness, but no swelling or redness and had full motor strength. The impression was a possible meniscal tear. X-rays taken on May 14, 2003 showed a possible enchondroma and the aftereffects of ACL repair. *Id.* at 135, 143. An MRI conducted on May 22, 2003 showed a complex meniscal tear. *Id.* at 133.

Cruz complained of right knee pain, but no instability, at clinic visits on October 29, 2003 and January 14, January 21, February 4, and February 18, 2004. *Id.* at 123-32, 141. A March 5, 2004 X-ray revealed no significant differences from his last X-ray. *Id.* at 114.

On March 11, 2004, Cruz was evaluated prior to arthroscopic surgery. He complained of knee pain, admitted smoking and drinking daily, and denied illegal drug use. *Id.* at 116-18. At 143 pounds, he appeared to be well nourished and in normal physical condition, but complained of occasional night sweats and depression. *Id.* He underwent successful arthroscopy with a partial meniscectomy[7] on March 30, 2004. Cruz reported weakness and clicking, but also a full range of motion, in his right knee in an April 7, 2004 visit. *Id.* at 109. The impression was that he was recovering from the arthroscopy. He walked out of the appointment without being discharged. *Id.*

---

[6] Chondroplasty is reparative or plastic surgery of cartilage. *American Heritage Medical Dictionary* (2007), *available at* http://medical-dictionary.thefreedictionary.com/chondroplasty.

[7] "Meniscectomy is the surgical removal of all or part of a torn meniscus." WebMD, *Meniscectomy for a Meniscus Tear* (2006), http://www.webmd.com/a-to-z-guides/meniscectomy-for-a-meniscus-tear.

2. *Dr. Paulette Stewart*

On October 15, 2003, Cruz first went to the Ryan/Chelsea-Clinton Community Health Center ("RCC") to be examined by Dr. Paulette Stewart. R. 203, 246-51. He had no complaints and no pain, and weighed 145.6 pounds. He reported a 1998 psychiatric hospitalization, and requested a mental health evaluation due to depression, though he denied suicidal ideation and impulsive thoughts. The impression of Dr. Stewart was that Cruz was HIV positive with dermatitis on his feet. Test results from that visit revealed Cruz's CD4 count[8] to be 870 and his viral load under 75.[9] *Id.* at 264-65. Dr. Stewart discussed his test results with him on November 10, 2003, and her impression was HIV and depression. On February 10, 2004, Cruz took tests revealing a CD4 count of 767 and a viral load of under 75. *Id.* at 261-62. He was also prescribed lotrisone cream for his feet. *Id.* at 243.

On March 10, 2004, Dr. Stewart completed a questionnaire for Cruz's attorney at the time, and she reported that he was HIV positive with a fair prognosis, *id.* at 196, and that he had daily right knee pain precipitated by walking, *id.* at 197, though she did not assess his ability to sit, stand or walk, *id.* at 198. She estimated that Cruz was capable of carrying and lifting up to 5 pounds frequently and up to 10 pounds occasionally, id. at 198-99, and didn't indicate any restrictions in his ability to perform repetitive motions, fine manipulations, or other movements such as reaching, grasping, and twisting, or that he had to avoid temperature or humidity extremes, respiratory irritants, humidity, heights, pushing, pulling, kneeling, bending and stooping. *Id.* at 199, 201. She indicated that Cruz had depression, which prevented him from

---

[8] The CD4 count is the number of CD4 T-lymphocytes in a cubic millimeter of blood. This count declines as an HIV infection progresses. MedicineNet.com, *Definition of Absolute CD4 Count* (2004), http://www.medterms.com/script/main/art.asp?articlekey=2100.
[9] Viral load refers to the amount of HIV virus in the blood. WebMD, *Viral Load Measurement* (2007), http://www.webmd.com/hiv-aids/viral-load-measurement.

performing even low-stress work, and that he would need to take unscheduled breaks for 15 minutes, needed restroom access, would be absent more than three times per month, and had psychological limitations.  *Id.* at 200-01.

At a follow-up visit on June 25, 2004, Cruz reported feeling well except for his right knee, and had a CD4 count of 956 and a viral load of less than 75.  *Id.* at 259-60.  He reported continuing knee pain when Dr. Stewart discussed his test results on July 20, 2004.  *Id.* at 215, 239.  He appeared at a follow-up appointment on December 7, 2004, when he appeared to be in his usual state of health, and testing revealed his CD4 count to be 643 and his viral load under 75.  *Id.* at 214, 238, 257-58.

On March 22, 2005, Cruz underwent a physical examination.  *Id.* at 234-36.  He weighed 135.4 pounds and reported losing 10-15 pounds over the past year.  He also reported night sweats, blurred vision, shortness of breath when walking up stairs, and right knee pain.  *Id.* at 235.  He was smoking cigarettes, drinking alcohol on weekends, and smoking marijuana three times per week. *Id.* at 234-A.  Test results from March of 2005 revealed Cruz's viral load to be under 75.  *Id.* at 308.

3.   *Dr. Scott Weisenberg*

On October 30, 2006, Dr. Scott Weisenberg completed an "AIDS/HIV Impairment Questionnaire" for Cruz's attorney. R. 285-90.  Dr. Weisenberg stated that he had seen Cruz quarterly since August 2005, and diagnosed him with HIV, depression, and right knee pain.  *Id.* at 285.   Cruz had no opportunistic infections (including bacterial, fungal, protozoan/helminthic or viral infections) and showed no evidence of weight loss.  *Id.* at 286-87.  He also had no neurologic, pulmonary, gastrointestinal, neoplastic, ophthalmologic,

7

hepatobiliary, nephrologic, cardiac, rheumatologic or endocrine complications. *Id.* at 285A-86. Dr. Weisenberg opined that Cruz was able to sit for one hour and stand or walk for one hour in an eight-hour workday; frequently lift and carry five pounds; occasionally lift 20 pounds, and occasionally carry 15 pounds. *Id.* at 288. Dr. Weisenberg opined that Cruz could perform low stress work.

    4.    *Dr. Todd Loftus*

On November 6, 2006, Dr. Todd Loftus, a psychiatrist, completed a questionnaire for Cruz's attorney. *Id.* at 327-34. He reported that he saw Cruz every two or three months since September 2005. He diagnosed Cruz with cocaine abuse, alcohol abuse, marijuana abuse, and depressive disorder, with a global assessment of functioning ("GAF") of 50. *Id.* at 327.[10] He found that Cruz had mood disturbance, substance dependence, suicidal ideation or attempts, and hostility and irritability. *Id.* at 328. His primary symptoms were abuse of multiple drugs (cocaine, alcohol, and marijuana), with depression, irritability and suicidal ideation likely due to the substance abuse. *Id.* at 329.

Dr. Loftus indicated that Cruz had no limitations in his understanding, memory, ability to carry out instructions or make simple work-related decisions. *Id.* at 330. He found that Cruz had mild limitations in his ability to complete a workweek uninterrupted and moderate limitations in his ability to maintain attention or concentration for long periods, to keep a schedule, and to sustain ordinary routine without supervision. *Id.* at 330-31. Dr. Loftus found

---

[10] A GAF between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." Am. Psych. Assoc., *Diagnostic & Statistical Manual of Mental Disorders, Fourth Edition: DSM-IV* 32 (1994). Dr. Loftus also reported that Cruz's highest GAF in the past year was 55. A GAF between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. *Id.*

Cruz mildly limited in maintaining socially acceptable behavior and hygiene and moderately limited in accepting supervisory instructions. *Id.* at 331. Dr. Loftus opined that Cruz might be a malingerer, *id.* at 333, and absences from work would depend on the frequency of Cruz's substance use, *id.* at 334.

     5.    *Consultative Examinations and State Agency Review*

Dr. E. B. Balinberg consultatively examined Cruz on November 17, 2004. R. 204-07. Cruz reported that he smoked cigarettes daily and drank alcohol moderately. *Id.* at 204. He was able to use public transit and did household chores and shopped, spending his time resting and watching television. He stated that he felt weak and had night sweats. Dr. Balinberg found no evidence of opportunistic infection and that Cruz's lymph nodes were not enlarged. *Id.* at 204-05. Cruz weighed 139 pounds, just under his reported usual weight of 140 pounds. He reported that his last CD4 count was 740 and his viral load was 10,000.

Dr. Balinberg observed that Cruz favored his right leg when walking, but had no difficulty rising from a seated position. *Id.* at 205. Cruz's right knee could flex from 0 to 110 or 120 degrees, but made a "pop" sound on extension. *Id.* He could raise his left leg straight to 80 degrees and his right leg to 70 degrees. His right leg had 4/5 motor strength, and he was sensitive to pressure over his right knee. Dr. Balinberg opined that Cruz's ability to stand or walk for long periods, to ascend or descend stairs, and to lift, carry, push and pull heavy loads was limited.

On that day, psychiatrist Dr. Mannuccio Mannucci consultatively examined Cruz. *Id.* at 208-10. Cruz reported that he had a GED and lived alone, though he had one or two friends and a girlfriend in Connecticut he would occasionally see. He was able to take public transit, take care of his personal needs, cook and shop for himself. *Id.* at 209. Cruz admitted to

abusing cocaine and alcohol as a teenager, but claimed that he had not done so for over 10 years. *Id.* at 208. Cruz stated that he had been perennially angry and discontented even before he had become HIV positive in 1992. He claimed that he had problems sleeping, a low appetite, low energy, and rarely interacted with people. *Id.* at 208-09. He also stated that he did not trust anyone. *Id.* at 208. Dr. Mannucci found that Cruz exhibited anger, paranoia and some depression, but was alert and oriented and able to handle monetary transactions, though he had impaired judgment and poor insight. *Id.* at 209. Dr. Mannucci diagnosed Cruz with affective disorder, depression, generalized anxiety with a possible paranoid psychotic feature, HIV and a right knee injury.

Dr. Max Brandt, a state agency psychiatrist, reviewed the record on December 14, 2004, and completed a psychiatric review form and a mental residual functional capacity assessment form relating to Cruz's mental functioning. *Id.* at 216-32. He found that Cruz was depressed but cognitively intact and able to adapt to a work setting. *Id.* at 219, 222, 231. Dr. Brandt opined that Cruz had mild limitations in the activities of daily living, moderate limitations in social functioning and concentration, and one or two episodes of deterioration, *id.* at 225, but that his mental impairments did not meet or equal any condition listed in the Listings of Impairments in Appendix 1 to the Subpart P of Part 404 of the Social Security Administration's regulations, 20 C.F.R. pt. 404, subpt. P, app. 1. R. 226.

C.   *Procedural History*

Cruz applied for disability insurance benefits on March 23, 2004, alleging an onset date of December 1, 2002. R. 42-46. His claimed disability status was based on HIV positive status, right knee impairment, and depression. *Id.* at 42. His application was denied on

February 22, 2005, *id.* at 30-34, and he requested a hearing, which was held on October 19, 2006 before Administrative Law Judge ("ALJ") Miriam L. Shire. *Id.* at 354-400. On March 2, 2007, ALJ Shire found that Cruz was not disabled. *Id.* at 10-20. In her written decision, ALJ Shire found that Cruz's depression was not "severe" within the meaning of 20 C.F.R. § 404.1520(a)(4)(ii), (c), but that his HIV infection and right knee impairment were. She found, however, that these impairments did not meet or equal any condition in the Listings of Impairments. ALJ Shire determined that Cruz had the residual functional capacity to perform sedentary work, to lift or carry up to 10 pounds, to sit six to eight hours in a workday, to stand or walk for up to two hours, and occasionally to climb ladders, kneel, stoop, crawl, and crouch. R. 17. Though she found that Cruz could not perform any past relevant work, *id.* at 18, she concluded that he could perform sedentary work and accordingly was not disabled. Her decision became the final decision of the Commissioner when the Appeals Council denied review on June 28, 2007. *Id.* at 4-6.

Cruz filed this appeal in the United States District Court for the Southern District of New York on October 2, 2007. It was subsequently transferred to this court due to Cruz's residence in the Eastern District of New York. Since filing his complaint, Cruz has not had any further contact with the court, and the contact information he provided has been found to be inaccurate, making it impossible for the court to contact Cruz. Cruz did not file an opposition to the Commissioner's motion for judgment on the pleadings or appear for oral argument.

DISCUSSION

A.   *The Legal Standard*

Under 42 U.S.C. § 405(g), I review the Commissioner's decision to determine whether it was "'supported by substantial evidence in the record as a whole or [was] based upon an erroneous legal standard.'" *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)). In deciding whether the Commissioner's conclusions are supported by substantial evidence, a reviewing court must "first satisfy [itself] that the claimant has had 'a full hearing under the Secretary's regulations and in accordance with the beneficent purpose of the Act.'" *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir 1982) (quoting *Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 38, 43 (2d Cir. 1972)).

Under the Social Security Act, Cruz is entitled to disability insurance benefits if, "by reason of [a] medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A), he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy," § 423(d)(2)(A). The Commissioner decides whether the claimant is disabled within the meaning of the Act. 20 C.F.R. § 404.1527(e)(1).

The Social Security Administration's regulations break down the inquiry into a five-step process:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability

to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (internal quotation marks and alterations omitted) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v) (setting forth this process).

B.  *The ALJ's Rejection of Cruz's Disability Claims*

   1.  *The Determination that Cruz's Depression Was Not a Severe Impairment*

While ALJ Shire noted, at the first step of the inquiry, that Cruz was not engaged in substantial gainful activity, at the second step she concluded that only his HIV status and knee injury, and not his depression, constituted severe impairments within the meaning of 20 C.F.R. § 404.1520(a)(4)(ii), (c). R. 15-16. Her finding that his depression was not a severe impairment was supported by substantial evidence.

Dr. Loftus reported that Cruz's primary problem was abuse of alcohol, cocaine and marijuana, and that his depressed mood, irritability and suicidal ideation were likely due to the drug abuse, and suspected that Cruz might be malingering. *Id.* at 329, 333. Dr. Loftus concluded that Cruz did not suffer from significant limitations that would prevent him from working. *Id.* at 330-32. This assessment is consistent with other evidence. Dr. Weisenberg

13

opined that Cruz could perform low stress work, *id.* at 289, Dr. Brandt indicated that he could adapt to a work setting, *id.* at 231, and Cruz indicated that he did not have difficulty getting along with authority figures, *id.* at 90.

Further, Cruz's testimony at his eligibility hearing strongly indicates that his depression does not seriously impair his functioning. He manages his own finances, performs personal care activities, household chores, and cooking. *Id.* at 85-88. He is able to travel outside the house, which he routinely does to attend Housing Works meetings and socialize. *Id.* at 360, 382, 389-90. Therefore, I find that the ALJ's finding that Cruz's depression was not a "severe impairment within the meaning of § 404.1520(a)(4)(ii), (c) was supported by substantial evidence.

2. *The Determination that Cruz's HIV-Positive Status and Right Knee Injury Do Not Meet or Equal the Conditions Set Forth in the Impairment Listings*

Having found that Cruz's HIV-positive status and right knee injuries were severe impairments within the meaning of 20 C.F.R. § 404.1520(a)(4)(ii), (c), the ALJ proceeded to the third step of the inquiry and determined that neither of them met or equaled the conditions set forth in the Listings of Impairments, 20 C.F.R. pt. 404, subpt. P, app. 1. Both such determinations were supported by substantial evidence.

Section 14.08 of the Listing of Impairments specifies that HIV qualifies only if it is accompanied by one of several aggravating factors such as opportunistic infections or significant involuntary weight loss. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 14.00(D)(1) ("Any individual with HIV infection, including one with a diagnosis of acquired immunodeficiency syndrome (AIDS), may be found disabled under this listing if his or her impairment meets any of the criteria in [§] 14.08 or is of equivalent severity to any impairment in [§] 14.08."); *see*

14

*generally id.* § 14.08(A)-(N) (listing qualifying impairments such as bacterial infections, fungal infections, protozoan infections, viral infections, malignant neoplasms, skin conditions resistant to treatment, hematologic or neurological abnormalities, significant weight loss, severe diarrhea resistant to treatment, and others). Substantial evidence supports the ALJ's finding that none of these factors was present in Cruz's case. The ALJ also found that Cruz's psoriasis did not combine with his HIV to equal a listed condition as there was no evidence that it was nonresponsive to treatment or that it affected or could reasonably be able to affect his work performance for a continuous 12-month period. R. 16.

Dr. Weisenberg specifically indicated that Cruz had no opportunistic infections, no complications, and no evidence of weight loss. *Id.* at 285A-87. Indeed, Cruz's weight has consistently been within several pounds of his self-described regular weight of 140 pounds. *Id.* at 117, 184, 204, 242, 246. Dr. Balinberg also found no evidence of opportunistic infections. *Id.* at 204-05. It is notable as well that at his hearing, Cruz himself did not describe his HIV-positive status as being one of the factors leading him to be out of work, attributing it instead to his knee injury and his depression. *Id.* at 393.

Substantial evidence also supports the ALJ's determination that Cruz's right knee injury did not meet or equal the conditions set forth in the Listings of Impairments. Sections 1.02 and 1.03 of the Listings of Impairments, referring to major weight-bearing joint dysfunctions and surgical reconstruction of such joints, require an "inability to ambulate effectively." 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02-.03. Inability to ambulate effectively is defined as inability to walk "without the use of a hand-held assistive device(s) that limits the functioning of *both* upper extremities," *id.* § 1.00(B)(2)(b)(1) (emphasis added), such as "a

walker, two crutches or two canes." *id.* § 1.00(B)(2)(b)(2). Given that Cruz only occasionally uses crutches or one cane and is able to walk and take public transportation multiple times per week, R. 85, 89-90, 374, 391-92, his own testimony establishes that his condition does not meet or equal the condition listed in §§ 1.02-.03.

       3.      *The Determination that Cruz is Capable of Performing Sedentary Work*

Having concluded that Cruz did not suffer from any impairments that met or equaled the conditions in the Listings of Impairments, the ALJ then concluded that while Cruz could not perform any past relevant work, R. 17-18, he retained residual functional capacity to perform sedentary work, *id.* at 16-17, and that this capacity, consistent with his age, education and work experience, allowed him to perform jobs existing in significant numbers in the national economy, *id.* at 18-19.

These findings were supported by substantial evidence. The only piece of evidence in the record inconsistent with the ALJ's assessment of Cruz's residual functional capacity is Dr. Weisenberg's conclusion that Cruz can only stand, sit, or walk for one hour in an eight hour day. *Id.* at 288. A treating physician's opinion about a claimant's impairment is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). When the Commissioner does not give a treating physician's opinion controlling weight, the weight given to that opinion must be determined by "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Schaal*, 134

F.3d at 503 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). The Commissioner must set forth "good reasons" for failing to accord the opinions of a treating physician controlling weight. *See, e.g.*, *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians [sic] opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

While the ALJ did not explicitly discuss the length, nature and extent of the treatment relationship or whether Dr. Weisenberg was a specialist, she did justify her decision to disregard Dr. Weisenberg's conclusions (though, she was careful to add, not his clinical findings) based on her assessment of the evidence in support of the opinion and its consistency with the record as a whole. As the ALJ properly determined, Dr. Weisenberg's conclusion that Cruz could only stand, sit or walk for one hour in a workday was not based on clinical findings and was also inconsistent with the entire remainder of the record. None of Dr. Weisenberg's clinical findings suggested so great an impairment, nor did the findings of Dr. Stewart or Dr. Balinberg. Indeed, even Cruz's own description of his daily activities, involving household chores, routine shopping trips lasting from an hour and a half to three hours, and regular subway trips from his third-story walk-up apartment to Housing Works, is inconsistent with so severe a limitation as Dr. Weisenberg described. Accordingly, the ALJ gave the required "good reasons," § 404.1527(d)(2), for disregarding Dr. Weisenberg's conclusion as unsupported by any clinical findings and also inconsistent with the entire record, which contained substantial evidence to support the ALJ's conclusion that Cruz is capable of performing sedentary work.

17

CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings is granted and Cruz's appeal is dismissed in its entirety.

So ordered.

John Gleeson, U.S.D.J.

Dated: March 2, 2008
      Brooklyn, New York